Move to our fourth argument of this morning, the United States v. Christopher Simmons, its appeal number 22-13-21. Yeah, Mr. Piotrkowski, good morning. Whenever you're ready. May it please the Court. We certainly recognize that a challenge of the sufficiency of the evidence presents an incredibly high bar. But we think in this instance, this case poses some fairly interesting questions that make this case somewhat atypical in terms of a challenge of the sufficiency. In Flores v. Figueroa v. United States, the Supreme Court analyzed the statute prohibiting aggravated identity theft, and it drew a clear line between a means of identification that is merely counterfeit, on the one hand, and a means of identification that the offender knows belonged to another person. Part of the reason that the Court drew this clear line was that it didn't want to turn this law into a lottery, where offenders who happen to guess right are guilty under 18 U.S.C. 1028a, and those who don't aren't. And that, in our opinion, is the biggest problem with the government's case here. The problem is that if we affirm the judgment here on this evidence that doesn't look like the evidence in any other case addressing a similar question, we leave open the possibility that Mr. Simmons happened to guess right and is nevertheless guilty under the statute. In other words, affirming the judgment here would blur the line that the Supreme Court drew in Flores v. Figueroa. The specific question before the Court today is whether the government presented enough circumstantial evidence for the jury to infer that Mr. Simmons knew the number he used belonged to a real person. The Seventh Circuit hasn't really articulated a broadly applicable standard on that question. It's sort of nibbled at the edges, but other circuits have. And as we note in our brief, the popular test involves repeated and successful testing of the means of identification prior to the charge conduct. It originated in the Eleventh Circuit, the Ninth, and Sixth Circuits. Both appear to have followed suit. Other courts have found that when the government presents evidence providing a little bit of color on how the offender obtained the means of identification, that that can be sufficient to create the permissible inference for the jury. In cases where the offender uses other items or information in conjunction with, in this case, the Social Security number that are also tied to the victim, that creates a permissible inference. Mr. Piotrkowski, let me tell you what's run through my mind, and you can tell me I'm mistaken or point me in another direction. When I look at the email exchange on the 23rd, you know it well, the one in Government Exhibit 118. It looks to me like your client, he succeeded in that initial credit card, you know, with the $15,000 credit card application. And then things go south for him when he gets greedy, and he asks for the auto loan right on the heels of the success with the credit card application. And then the fraud flag goes off, and it's unwound, and they tell him he's got to come in and open a savings account, et cetera, et cetera. My question is this. Why couldn't a jury, when they're gathered and deliberating, say that he had to have known when he was approved for that credit card before he oversteps and asks for the auto loan right on the heels of that. But he had to have known at that point in time that he either guessed right on the Social Security number, or the Social Security number he bought on the street, or whatever people are thinking, you know, it's real. Because there's no way he would have been approved. And then he turns around, of course, on the 24th. Do you see where I'm going with this? I do. Okay. So my question is, under the standard of review, which you quite candidly acknowledge, we appreciate that, why couldn't a jury sitting in the room deliberating say, oh, he knew. And the reason he knew is because he got approved for that credit card on the 23rd. Your Honor, I do not mean to be glib. No, go for it. It's quite simply because a success ain't a success unless it's successful. And ultimately, that same provisional, what the government is now referring to as a provisional approval, ultimately that application was denied within hours on the same day, and Mr. Simmons was informed of that fact on the same day in real time. Right, right. So in other words, he wasn't successful in obtaining credit. He was informed via email that he had been approved, but that there were extra steps that he had to take for them to be approved. So I get that argument. I think that's the argument you have to make. And the question that I keep coming back to is, is the jury compelled to go down that road as opposed to the one I was going down and articulating the question to you because I thought the only reason he's denied is because he makes the very bad choice on top of trying to defraud the bank to begin with, but he makes the very bad choice of asking for the auto loan immediately. And that's where the red lights and sirens go off for the bank. Yeah. We're not here to argue that my client is guilty of good judgment. No, no, no. I know. But it's, you know, I think, I don't know. It just seems to me a jury could say he knew he got approved for that credit card and then he screwed up. Well, let me try to address your question in terms of the case law. Yeah. Go ahead. And the problem here is, as I said before, the popular test is repeated and successful testing prior to the charged conduct. So as a threshold matter, this provisional approval that took place, which may or may not be a success within the meaning of 1028A, did not take place prior to the charged conduct. This is all within the conduct that's the subject of the complaint. Well, hold on. Isn't count the 1028A counts tied back to count two, is it not? Correct. But he was also charged with bank fraud in connection with the initial applications, if I'm not mistaken. Okay. Let me just look at count. So count two, yeah, count two is what happens the next day. Correct. January 24th, right? Correct. And that's when he reuses. Your point, of course, is he didn't know when he reused that it belonged to a person because he was unsuccessful on the 23rd. Not only that, Your Honor, but he was specifically told that they weren't going to rerun his credit no matter how many applications he submitted within a 30-day timeframe. So as far as he knew, the lender's scrutiny to which he was subjecting this number was only going to take place once and only on the first application that he submitted. And he was successful. And why isn't that just an issue of fact for the jury? Right. I agree that's a factor you could argue, but that sounds like a jury argument to me, not a sufficiency of the evidence when we're reviewing the record in the light most favorable to the government. The only answer that I can give you on that count, Your Honor, is that in every other case where the court has faced a similar question, in other words, what is the critical mass of circumstantial evidence that the government has to show that permits the jury to make that inference? And in every other case that addresses that question, the facts frankly just look different. There's an added piece of information or an added document that's used in conjunction with the Social Security number. There are verified, successful, and repeated tests, in some cases over a span of several years. What about the use 10 to 15 times with various lenders before he submitted the Social Security number in connection with the credit card here? I'm glad you brought that up because, and I've read the record several times now, and I can't tell if the government made any attempt. In fact, as far as I'm concerned, they didn't make any attempt to tie those open inquiries, the number of which is somewhat nebulous, to tie those open inquiries to Mr. Simmons. And the fact that the number did belong to a real person raises the possibility that they were all or some or most his doing. The government presented no evidence that indicated that Mr. Simmons was directly tied to those additional inquiries at other financial institutions, and the government made no attempt to show that any of those inquiries were successful. And so I think that that fails on both counts. You want to save your remaining time? I will. It's up to you. No, I will. Thank you. Okay.  Very well. Ms. Boyle, good morning. Good morning, Your Honors. May it please the Court, Counsel, my name is Catherine Boyle on behalf of the United States. Defense Counsel has recognized the high bar for the sufficiency of the evidence issue here, whether any rational juror could have found Mr. Simmons guilty of sexual assault. Here, the only issue is whether he knew the social security number he used belonged to another individual. Initially, Mr. Simmons' counsel makes the point that this case is not like exactly like any other case cited in the briefs. It doesn't have to be. What we're evaluating here is whether there was enough circumstantial evidence for any rational juror to have determined Mr. Simmons knew the  Here, there was ample evidence in the record. As Your Honors noted initially, we have the fact that Mr. Simmons knew that the social security number had been successfully run in relation to his first MasterCard application. And he was told that in very clear terms by Greg Davis in an email. We also can consider the fact that Mr. Simmons does decide to repeatedly submit the social security number, including after that pre-approval, to the bank for potentially additional scrutiny. And it's not clear that Mr. Simmons . . . I agree that there is a factual issue here, but it's a factual issue for the jury, as to whether Mr. Simmons believed that the social security number would be run again. I believe there was an indication in this case, especially once Mr. Simmons' application was flagged for fraud, he might not have known if it would be run again or not. He doesn't know the bank's processes at that point. Additionally, we have the issue of the signature card when he opened the savings account. And that to me suggested that the bank was not running his identification information for a credit card check. And Mr. Simmons was explicitly told that on the social security card. It shows that the bank and the financial institution, the credit union in this case, was more interested in verifying Mr. Simmons' identity to prevent money laundering, to prevent terrorism, which suggests potentially a different check and another use of that social security number where it could be rerun. In addition to this repeated and knowing subjection of the social security number to lender scrutiny, it's quite significant in this case that Mr. Simmons continues to do that even after he is flagged for fraud. He is so confident in his social security number that he actually agrees to go into the bank and does go into the bank. Sorry, into the credit union. I keep saying that incorrectly, Your Honors. Goes into the credit union and while he's at the credit union, he emails Greg Davis and says, hey, should I check in about that sort of potential denial of my credit card application? This is noteworthy confidence in the social security number and in the information he's submitting that he is willing to be at the financial institution and asking questions about the denial of the application. I also think a really interesting point in this case is there is one point in time where Mr. Simmons provides a social security number where he does not believe it's going to be run. That is when he goes to cash the check related to the Audi loan that Mr. Canterbury obtained. So Mr. Simmons goes to cash this check. He actually provides an ID. He gets cash in hand and at that point, as he's about to leave the bank, they say, oh, could we get your social security number? He writes down a number on a scrap piece of paper that doesn't have an actual social security number. That choice to me seems deliberate. It's the only point where we know Mr. Simmons didn't believe that number or at least was likely to think that that number was not going to get any additional scrutiny. Additionally, the jury could have looked at the fact it's pretty coincidental. Mr. Simmons applies for some very expensive car loans and conveniently has a credit score of 796, which is quite high. A jury could infer from that that Mr. Simmons had deliberately selected a social security number with a high credit rating to make this fraud scheme more successful. Additionally, I think Judge St. Eve mentioned the issue that there were multiple open credit checks from other financial institutions regarding the social security number used by Mr. Simmons. That too indicates his confidence this is a real number that he wants to repeatedly use. He's not just making up a series of social security numbers and trying them out to see if they work. I would also note that in the case law, the case law repeatedly says a reasonable jury can infer that financial institutions are only going to offer savings accounts, credit to real people, and Mr. Simmons also used real information throughout his scheme. Your Honor, I'd like to move on briefly to the loss amount issue as well. Here, the court is reviewing for a clear error the district court's determination of loss, so we're looking at another high bar. First of all, I'd like to note, defense counsel has cabined this issue to whether the loss amount was above $150,000. Even if we were to take out one of the credit card applications, we would still be above the $150,000 amount and we would still have the 10-level increase. Here, we think that all of those were appropriately included. The district court decided that on the basis of the entire record in the case, Mr. Simmons showed, as Judge Scudder, as you noted, incredible greed. The court found that the gist of the entire record demonstrated that Mr. Simmons was trying to get as much money as possible from the bank. Of course, the court didn't include Mr. Simmons' withdrawn application, but the court did include the amount obtained for the Audi loan, the first MasterCard application, the unspecified auto loan, and the second MasterCard application and the Maserati application. There is no evidence on this record. Defense counsel tries to say that Mr. Simmons was only interested in one  conduct based on the Audi loan. We know Mr. Simmons was interested in more than one car loan because they had already achieved the Audi loan. It's also interesting that when Mr. Simmons submits his second credit card application, Mr. Canterbury, his conspirator essentially, the person he's plotting with for these fraud schemes, submits a credit card application about five minutes afterwards. These are two individuals who are just trying to get as much money as possible out of the credit union. After their initial success with the Audi loan, they viewed the credit union as an easy mark. And this is a factual determination by the district court. And on the record that we have here, we cannot say that the district court clearly erred. If there are no further questions, the government will rest on the arguments in this brief and request that the court affirm. Thank you, Your Honors. Okay. Very well. Thank you, Ms. Boyle. Yeah, Mr. Piekowski. Just a couple quick points. With respect to the government's argument that Mr. Simmons displayed noteworthy confidence when he submitted these applications, the case that the government cites in support of that argument, Doe v. United States, I believe it's an 11th Circuit case, the court in that case specifically cited the fact that the defendant in that case had repeatedly and successfully tested the means of identification. And that was the most significant factor in them determining that there was a sufficient nexus for the jury to infer the requisite knowledge of the statute. And moreover, they said that his noteworthy or unfaltering confidence, is the way they described it in the case, was stacked on top of this repeated and successful testing. My bottom line here is that that illustrates the point that this case, this nucleus of facts in this case, is substantially different from the other jurisdictions. Point one. Point two on the district court's error in terms of calculating Mr. Simmons' intended loss. I would just point out that it was the government's burden to prove and the district court's obligation to find by a preponderance of the evidence that Mr. Simmons was being sentenced only for the loss that he intended. And what is problematic to us here is the fact that during the sentencing hearing, the judge, in adopting the government's argument that Mr. Simmons was out for everything he could get, appeared to point to a lack of evidence on Mr. Simmons' part, as opposed to an accumulation of evidence on the part of the government. And I think that's problematic. And if there aren't any other questions about that, then. Okay. Very well. Mr. Piekowski, Ms. Boyle, thank you very much. Mr. Piekowski, you took the case on appointment from the court, right? I did. We very much appreciate you doing that. You served your client well, and thanks to your firm too. You're welcome. Okay. Thank you.